COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-07-234-CR

 

 

JOSHUA DALLAS WHITE                                                      APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

         FROM COUNTY
CRIMINAL COURT NO. 5 OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Appellant Joshua Dallas White pled nolo
contendere to and was convicted of driving while intoxicated (DWI) but reserved
his right to appeal the trial court=s denial
of his motion to suppress.  Because we
hold that the trial court erred by denying Appellant=s motion
to suppress, we reverse the trial court=s
judgment.








On May 24, 2006, Police Officer Kelly Nichols
stopped Appellant in The Colony, Texas, and, based on the stop, arrested him
for DWI.  On June 29, 2006, Appellant was
charged by information with DWI. 
Appellant filed a motion to suppress the evidence based on the
stop.  

At the hearing on Appellant=s
motion, Nichols testified that while on duty on May 24, 2006, around 1:22 a.m.,
she observed Appellant driving below the legal speed limit on FM 423 on the
south side of The Colony.  Nichols
observed Appellant drift within his lane and make two sudden lane changes,
using his turn signal each time.  After
observing Appellant for two-to-three hundred yards, Nichols turned on her
in-car camera.  She saw Appellant=s
vehicle cross a yellow line separating the lane from the shoulder.  She further observed the tires of his car hit
(but not cross) the road=s center line Aevery
once in a while.@ 

Nichols noticed that Appellant had made a number
of left turns, and in her opinion he appeared to be driving in a circle.  She testified that depending on the
situation, a person making a block is suspicious.  Based on her observations, she decided that
she Aneeded
to go ahead and make a traffic stop to check the welfare of the driver of the
vehicle and make sure that everything was okay with the driver, whether he was
intoxicated or a medical problem that he was having or something like that at
the time.@








Additionally, we have carefully reviewed the
videotape from the in-car camera.  The
tape clarifies the circumstances of the stop. 
When Nichols approached Appellant=s car,
she did not ask if he needed assistance. 
Instead, she told him that he had been swerving in and out of lanes and
asked, ADo you
have any explanation?@ 
She did not ask if he was ill, but immediately asked if he had been
drinking.  In observing the progress of
Appellant=s car, we note that it was not
swerving in and out of lanes, was not going particularly slowly, and was
maintaining a single lane except for signaled lane changes.   

The trial court denied the motion to suppress,
and Appellant entered a plea of nolo contendere pursuant to a plea
bargain.  The trial court convicted
Appellant and sentenced him to seventy days in jail.  Appellant timely appealed.

In a single issue, Appellant argues that the
trial court erred by finding that his detention was properly supported by the
evidence and, therefore, denying his motion to suppress.  The State argues that the evidence shows that
Nichols could have reasonably initiated the stop of Appellant=s car
for suspicion of criminal activity, specifically DWI, or to exercise the police=s
community caretaking function and that the traffic stop was proper under either
theory.  The trial court entered no
findings of fact or conclusions of law.








A detention, as opposed to an arrest, may be
justified on less than probable cause if a person is reasonably suspected of
criminal activity based on specific, articulable facts.[2]  An officer conducts a lawful temporary
detention when he or she has reasonable suspicion to believe that an individual
is violating the law.[3]  Reasonable suspicion exists when, based on
the totality of the circumstances, the officer has specific, articulable facts
that when combined with rational inferences from those facts, would lead him to
reasonably conclude that a particular person is, has been, or soon will be
engaged in criminal activity.[4]  This is an objective standard that disregards
any subjective intent of the officer making the stop and looks solely to
whether an objective basis for the stop exists.[5]

The phrase Atotality
of the circumstances@ also applies to the
determination of the propriety of a stop based on the community caretaking
function.[6]  In Corbin v. State, the Texas Court of
Criminal Appeals explained,








. . . .  Whether a stop is
reasonable depends on Aa balance between the
public interest and the individual=s right to personal security free from arbitrary
interference by law enforcement.@  A seizure
based on reasonable suspicion or probable cause will generally be
reasonable.  

 

But even without reasonable suspicion or probable cause that an
offense has been committed, a police officer may reasonably seize an individual
through the exercise of his community caretaking function.

 

. . . .  As part of an officer=s duty to Aserve and protect,@ an officer Amay stop and assist an
individual whom a reasonable person, given the totality of the circumstances,
would believe is in need of help.@  The
community caretaking function, however, is Atotally divorced from the detection,
investigation, or acquisition of evidence relating to the violation of a
criminal statute.@  As a result, a police officer may not
properly invoke his community care taking function if he is primarily motivated
by a non-community care taking purpose. . . . A[W]e must determine if
[the officer] acted reasonably when he stopped the vehicle out of concern
for the welfare of appellant.@ . . . Professor Lafave explains, A[I]t apparently remains
open to defendants whenever the challenged seizure or search is permitted
without probable cause because of the special purpose being served, to
establish a Fourth Amendment violation by showing the action was in fact
undertaken for some other purpose.@[7]

 








The Corbin court explained that when the
record reflects that the officer was concerned that the defendant was tired but
was also concerned that the defendant might be drunk, the trial court, as the
exclusive judge of credibility and finder of fact, could properly conclude that
the officer was primarily motivated by community caretaking concerns.[8]  The Corbin court then explained how to
decide whether an officer=s belief that an appellant
needed help was reasonable: 

Once it is determined that the officer is primarily motivated by his
community caretaking function, it must then be determined whether the officer=s belief that the
defendant need[ed] help [was] reasonable. 
In evaluating whether an officer reasonably believe[d] that a person
need[ed] help, courts may look to a list of four non-exclusive factors: (1) the
nature and level of the distress exhibited by the individual; (2) the location
of the individual; (3) whether or not the individual was alone and/or had
access to assistance other than that offered by the officer; and (4) to what
extent the individual, if not assisted, presented a danger to himself or
others.

 

Because the purpose of the community caretaking exception is to allow
an officer to Aseize@ and assist an individual
whom he reasonably believes is in need of help, the first factor is entitled to
the greatest weight.  The greater the
nature and level of distress exhibited, the more likely the police involvement
will be a reasonable exercise of the community caretaking function.  This is not to say that the weight of the first
factor alone will always be dispositive. 
In fact, the remaining three factors help to give more definition to the
first factor.  A particular level of
exhibited distress may be seen as more or less serious depending on the
presence or absence of the remaining three factors.[9]

 








In the case now before this court, Officer
Nichols testified, in regard to the level of distress, that Appellant was
driving below the posted forty-five mile per hour speed limit.  Rather than testifying that this was an
indication of distress, however, she testified that it was approximately 1:22
a.m. and that that was near the time the bars closed.  Nichols was traveling on road FM 423, and she
noticed a vehicle that was driving under the speed limit, the Aposted
speed limit is forty-five miles per hour, so anything under that usually isCkinda
look at that vehicle twice.@  She explained that she was suspicious of a
vehicle traveling under forty-five miles per hour in that area because A[t]hat
area at that time of night can get a lot of peopleCa lot of
bars start to close around the area. 
Could get a lot of people leaving the bars, and that would be why they
might be driving under the speed limit.@

Nichols testified that she first spotted
Appellant=s vehicle about a quarter of a
mile away from any bar.  She testified
that other suspicious driving facts included his drifting within his lane and
the sudden lane change from the right lane to the left lane and then, later,
another lane change from the left lane to the right lane.  She admitted, however, that Appellant
signaled both lane changes. 








After following Appellant=s
vehicle for two hundred to three hundred yards, she turned the car-mounted
video on.  She continued to follow
Appellant and describe his car as drifting within its lane.  Occasionally, the tires would hit the center
line of the two-lane road.  She had not
turned her camera on until Appellant turned northbound on Highway 121.  She testified that in her experience, A[U]sually
when there=s drifting in lanes, there=s one of
two things, either somebody has been traveling a lot and is tired or they=re
intoxicated.@ When asked if she had seen any
other cars that perhaps the driver of the vehicle was trying to avoid, Nichols
said she did not recall any other vehicles at that time. 

Appellant turned left on Paige Road, going back
into the city.  Nichols testified that he
was going pretty much in a circle, and she found that suspicious.  She claimed that at some point she saw
Appellant=s vehicle cross a yellow line
separating the lane from the shoulder, and at some point she initiated a
traffic stop.  When asked why she stopped
Appellant=s vehicle, Nichols testified,

After following the vehicle for a little while and observing the
drifting and then the actual entire tires of the vehicle crossing over that
line, I determined that it was probablyCI probably needed to go ahead and make a traffic
stop to check the welfare of the driver of the vehicle and make sure that
everything was okay with the driver, whether he was intoxicated or a medical
problem that he was having or something like that at the time.

 

Nichols also testified that she had no doubt as
to whether she had reasonable suspicion to make the stop.  When she activated her overhead lights, it
took only thirty seconds for Appellant to stop. 








There is no indication of how slowly Appellant
was traveling.  The only evidence is that
it was below the forty-five mile per hour speed limit.  There is no indication of the speed limit on
Highway 121 or on any of the streets on which Appellant traveled while Nichols
observed him, other than FM 423, and no indication whether he traveled below or
near the speed limit on the other streets. 
In analyzing the first factor, the evidence of distress is minimal and
weighs against the State.  

Concerning the second factor, nothing in the
record indicates that Appellant was in an isolated area.  Indeed, FM 423 is also known as Main Street
in The Colony and Josey Lane south of the city limits, and Highway 121 is a
major highway.  The second factor is
either neutral or weighs against the State. 


Regarding the third factor, the record indicates
that Appellant was alone in the automobile but that he was not in an isolated
area, and, indeed, the record indicates that he was in a commercial area with
businesses, albeit bars, still open. 
Officer Nichols, therefore, was not his sole access to assistance.  The third factor is neutral.  

The fourth factor, the extent to which the
individual presented a danger to himself or to others if not assisted, weighs
against the stop.  Indeed, Officer
Nichols admitted that Appellant posed no threat to others.  He was sufficiently aware to signal lane
changes, there was no indication that he failed to signal his turns, and he
traveled in a distinct pattern, although Nichols found it suspicious.  








Applying
the Corbin factors, we conclude that Officer Nichols=s
exercise of her community caretaking function was not reasonable.  There is no indication that Appellant
appeared to be in danger of falling asleep, and indeed  Nichols did not testify that that was her
fear.  Rather, she emphasized the
suspicious nature of Appellant=s
actions.  Accordingly, Appellant=s Ainterest
in being free from arbitrary government interference outweighed [the officer=s]
exercise of [her] community caretaking function.@[10]  

We must
now determine whether there was reasonable suspicion to justify the stop.[11]  A diagram of the area helps explain the
driving pattern in addressing whether the driving pattern provided reasonable
suspicion for a stop.[12]  Appellant drove south on FM 423 (also known
as Main Street and Josey Lane), east on Highway 121, a divided highway, left at
the first exit, which was Paige Road, and then turned under Highway121 and
drove back west on Highway 121.[13]  








Nichols
testified that she did not issue Appellant a ticket and that she probably would
not have given him a ticket for any of his conduct described in her
affidavit.  After watching the video, we
likewise conclude that Appellant committed no traffic violation; he just drove
a route that she would not have taken. 
We hold that, without more, driving on a route that is not the most
direct route to a destination does not provide reasonable suspicion to stop a
person.[14]


Having
given close attention to the videotape and considering the totality of the
circumstances, including the entire record and all permissible inferences from
the record, we hold that the officer did not have reasonable suspicion to stop
Appellant.[15]









        Because
the officer did not have reasonable suspicion to stop Appellant and because her
exercise of the community caretaking function was not reasonable, we hold that
the trial court erred by overruling Appellant=s motion
to suppress.  Consequently, we sustain
Appellant=s sole issue, reverse the trial
court=s
judgment, and remand this case to that court for further proceedings consistent
with this opinion. 

 

LEE ANN DAUPHINOT

JUSTICE

PANEL B:   DAUPHINOT, HOLMAN, and WALKER, JJ.

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  April 24, 2008











 
 
 
 
 
 
 
 
 
 
 
  
 


                                                Appendix
A

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

This is a rough, unscaled sketch of the area in
which Appellant and Officer Nichols drove. 
For a detailed map of The Colony, see, e.g., Mapsco, Inc, Dallas Street Guide 553-54 (2008).  Also see the maps at the city=s website,
http://www.ci.the-colony.tx.us.











[1]See Tex. R. App. P. 47.4.





[2]Terry v. Ohio, 392 U.S. 1, 22, 88 S.
Ct. 1868, 1880 (1968); Carmouche v. State, 10 S.W.3d 323, 327B28 (Tex. Crim. App.
2000).





[3]Ford v. State, 158 S.W.3d 488, 492
(Tex. Crim. App. 2005).





[4]Id. at 492B93.





[5]Id. at 492.





[6]Corbin v. State,
85 S.W.3d 272, 276 (Tex. Crim. App. 2002).





[7]Id. at 276B77
(citations omitted).





[8]Id. at 277.





[9]Id.





[10]See id. at
278.





[11]See State v. Stevens, 235 S.W.3d 736, 740  (Tex.
Crim. App. 2007); Armendariz v. State, 123 S.W.3d 401, 404 (Tex. Crim.
App. 2003), cert. denied, 541 U.S. 974 (2004) (providing that we must
uphold the trial court=s ruling if it is supported by the record and correct
under any theory of law applicable to the case).





[12]See Appendix
A.





[13]See id.





[14]See Saenz v. State, 842 S.W.2d 286, 289 (Tex. Crim. App. 1992) (AAlthough
Mendoza stated Highway 67 was a primary route for smuggling operations, we do
not believe appellant's mere presence on Highway 67 can be deemed suspicious
merely because of a high incidence of smuggling in the area.@).





[15]See id.;
State v. Huddleston, 164 S.W.3d 711, 716 (Tex. App.CAustin
2005, no pet.) (AWitnessing Huddleston safely cross the fog line five
times over a stretch of six miles did not give [the police officer] a reason to
suspect that she was unsafely failing to remain in a single lane in violation
of section 545.060 [of the transportation code].  The trial court did not err in concluding
that the officer did not have a reasonable suspicion that section 545.060 was
being violated.@).